IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____
                                              :
GRACIANA DIAZ on behalf of N.D,               :
a minor                                       :        Civil Action No. 07-5672 (PGS)
                 Plaintiff,                   :
                                              :
        v.                                    :
                                              :               OPINION
COMMISSIONER OF SOCIAL SECURITY,              :
                                              :
                 Defendant.                   :
                                              :
_____:

SHERIDAN, U.S.D.J.

        Before the Court is an appeal by Graciana Diaz ("Diaz " or "Plaintiff") on behalf of her

daughter, N.D., a minor, from the final decision of the Commissioner of the Social Security

Administration ("Commissioner") denying her request for Child Supplemental Security Income

("SSI"). Plaintiff filed an application for SSI on December 16, 2004. Following usual procedures,

a hearing was held on September 27, 2006 before ALJ Joel H. Friedman ("ALJ"). On May 25, 2007

the ALJ denied Plaintiff's application. Upon appeal, the Appeals Council found no grounds for

review on September 25, 2007. This action was timely commenced.

I.

        Plaintiff filed an application for SSI alleging N.D.'s disability since July 14, 1999 due to a

learning disability, an affective disorder (depression) and anger management problems. N.D. is a

12 year old girl who was born on July 14, 1996. She lives with her mother and two brothers. Her

parents have been separated since 1992. She sees her father on the weekends. She currently attends

1

school in the Carteret Borough Public School (Middlesex County) New Jersey, and is receiving special education accommodations due to her learning disability.  During N.D.'s early years (3 - 5 years), N.D. had early intervention services for speech delays. In addition, N.D. had been in a special education programs since kindergarten.  N.D. had disruptive behavior by intermittently fighting with her peers. N.D. frequently refuses to attend school, has temper tantrums, and is easily overwhelmed. She is easily upset when not near her mother, and had been sharing a bed with her for a few years. (R. 124).  More specifically, Plaintiff alleges that N.D. "cannot read or write and gets a lot of headaches from stressing over trying to do her homework" (R. 78).  With regard to mode of living and current functioning, N.D. can dress, bath and groom herself; but frequently refused to dress without assistance from her mother.  Socially, she is dependant and clings to her mother, acts immaturely, and has no close friends (R. 125).  There was one incident where N.D. brandished a knife at her brother on retaliation for calling her fat.  N.D. was diagnosed with depression and anxiety in August 2006, and has been taking Zoloft 25 mg for those conditions.

There are several school reports and evaluations which were considered by the ALJ in his opinion. They are outlined below.

The Middlesex County Educational Services Commission undertook a psychological evaluation of N.D. on May 18, 2004.  At the time of the evaluation, N.D. was polite, personable, talkative and was neatly groomed and casually dressed. According to the evaluator, the most noteworthy observation was the good effort that N.D. made on all assigned tasks. N.D. was administered the Wechsler Intelligence Scale for Children - Third Edition.  This is a standardized intelligence test used to assess many different cognitive abilities which together reflect intellectual ability.  N.D.'s verbal IQ score was 74 (borderline), and her performance IQ score was 86 (low

average).  Overall, her full scale IQ score of  78 was borderline. The scores showed that N.D. found it difficult to keep up with the other seven year old students in her class when her thinking and reasoning skills were needed (R. 112-13).  The recommendation was vague but mandated that the child study team develop modifications and instructional strategies for  N.D. to achieve at a level commensurate with her cognitive potential in school.

In response, the school district undertook the necessary steps to evaluate N.D. in the classroom setting and her teachers were asked to complete a questionnaire.  On January 6, 2005, N.D.'s third grade teacher indicated that N.D.'s current instruction level was first grade for reading and written language, and third grade level for arithmetic.  With regard to "Acquiring and Using Information", the teacher noted that N.D. had a "serious" problem with understanding school and content vocabulary, reading and comprehending written material, providing organized oral explanation and learning new material.  In addition, the teacher found that N.D. had "slight" problems in comprehending oral instruction, comprehending and doing math problems, understanding and participating in class discussions and recalling and applying previously learned materials.  The only "very serious" problem noted by the teacher was in the area of expressing ideas in written form. (R. 115).  With regard to "Attending and Completing Tasks", this teacher found "obvious" problems in paying attention, carrying out multi-step instruction, and waiting to take turns. However, there were no "serious", or "very serious" problems noted in the domain of attending to and completing tasks. (R. 116).  Similarly, in the domain of "Interacting and Relating With Others", the teacher found a "serious" problem in the area of expressing anger appropriately, and "obvious problems" following classroom rules, and respecting/obeying adults in authority.  The teacher noted that N.D. "at times needs to be moved away from other students so she can calm down." With regard

to the domain of caring for herself, there were "obvious" problems in handling frustration appropriately and being patient when necessary.  There were no serious or very serious problems noted in this domain  (R. 119).   Finally, in the domain of "Moving about and Manipulating Objects", there were "no problems" observed (R. 118).  It was also noted that there were no issues with regard to absenteeism from school due to Plaintiff's condition.  (R. 120).

At the end of the school year (June 1, 2005), the Carteret Department of Special Services met to discuss and prepare an Individualized Education Program (IEP) for N.D. for fourth grade. (R. 149-182).  At this meeting,  it was noted that N.D. had shown a dramatic change since September of that same school year, and that the "days where it was a battle to get her to work and her attitude was unbearable" had become "fewer and farther apart."  She still is angry, but not as often.  Her teachers were proud of her progress.  She was still reading at a first grade level, but had strong math skills (was working at grade level in math).   In addition, N.D. had met all of her speech therapy goals for the year (R. 149-182).

In February, 2006, the IEP team met as part of an annual review and to prepare a program for N.D. for grade five and to address her learning and/or language disabilities which were noted to be "mild/moderate" (R. 183-210).  N.D. was still reading at a first grade level, but continued to have strong math skills and she was working enthusiastically at becoming a better writer.  Her writing skills were noted as slowly emerging.  It was noted that N.D. was not exhibiting behavior that would impede her learning or that of others (R. 187).

An Individual Student Report of spring 2006 noted that N.D. was partially proficient in language arts/literacy, partially proficient in mathematics and proficient in science (R. 211-214).

On January 11, 2005,  N.D. was seen by Lena Halperin, LCSW  at University of Medicine

and Dentistry of New Jersey (UMDNJ) for  depression, anxiety and anger management.  At that time,  N.D.'s mother was upset about N.D. behavior, i.e. N.D. "gets upset when things happen at school" (R. 134).   She reported anger management problems and some sibling jealousy.  Plaintiff's mother reported that N.D.'s behavior  problems at school stem from an incident where N.D. was suffocated by a classmate and N.D. was too scared to return to school after that incident (R. 135).  In addition, N.D. was easily distracted by other students, worries, bites her fingernails and sucks her fingers to keep calm. She can not fall asleep unless her mother is with her.  N.D. did not exhibit any suicidal ideation or psychotic symptoms.

Dr. Halperin found N.D. to be cooperative and her motor activity, speech, thought processes and thought content were unremarkable; but her mood was sad and worrisome. Based on same, Dr. Halperin diagnosed N.D. with depressive disorder and at this time, it was recommended that N.D. be prescribed Zoloft, continue individual and family therapy, and learn positive affective anger management skills.

According to the record, N.D. was next seen at UMDNJ Behavioral Health in May, 2005 and treatment continued through 2006  (R. 237- 255).  The treatment plan focused on anger management and building self esteem to overcome feelings of sadness, low self esteem, somatic complaints and to avoid conflicts at school, and with her brother.  Treatment notes of July and August, 2005 showed improvement.  N.D. was found to be in a good mood and she denied depressive symptoms.  She was less tearful, and her mood improved on a higher dose of Zoloft (R. 230, 231, 233, 234, 236). Similarly,  treatment  notes  from  January  and  February  2006  continued  in  the  same  positive progression.  During this time period, she completed work assignments, and enjoyed a class where she was reading more.  Her depression and aggression subsided.  Should could sleep alone (without

her mother).  Although there was improvement, conflicts at school and with her brother persisted (R. 222, 223).  For example, on May 8, 2006 progress note related an incident where N.D. accused a teacher of being "rough" after N.D. disrupted the class.  At that session, N.D. was dysphoric and unwilling to talk.  She had no insight as to her role in the incident (R. 219).  In another June, 2006 event, N.D. was upset about sharing her toys with her cousin.

The Social Security Administration sought psychological evaluation of N.D..  Alan Dubro, Ph.D., a licensed psychologist, performed an Intelligence Evaluation on N.D. on January 26, 2005. At the time of the examination, N.D. was eight years old.  A standardized intelligence test (WISC-IV) found that Plaintiffs's verbal scale IQ was in the average (92) range and significantly greater than her overall performance IQ (82).  Overall, she was functioning in the low average range of intelligence.  She performed in the average range on tests that correlated with academic achievement and those that assess abstract verbal reasoning. On performance subtests, N.D. performed in the low average range and displayed mild psychomotor slowing (R. 124).  The standardized achievement measure (WRAT-III) found her reading/decoding score to be commensurate with her current grade level (3rd).  Dr. Dubro found that N.D. is capable of attending to, following and understanding age appropriate directions; and can complete age appropriate tasks with assistance, but had significant difficulty maintaining appropriate social behavior.  She was diagnosed with separation anxiety disorder, and continued psychological treatment was recommended (R. 125).  Her prognosis was guarded.

## II.

At the hearing on September 27, 2006, the ALJ questioned Miss Diaz (N.D.'s mother) with regard to her daughter. According to her, N.D. was disabled due to her reading and writing skills,

and feels that N.D. will not be able to go to work as an adult if she can not read and write. N.D. is often frustrated and cries, and at the time of the hearing, Ms. Diaz testified that N.D. could only read at a second grade level. She further testified that N.D. does not have any physical problems, but had trouble sleeping. The mother confirmed that N.D. was taking Zoloft for depression and saw a psychiatrist every month. Plaintiff testified that N.D. was in smaller classes due to her learning disability, and that she was promoted to the fifth grade in a class of only 8 children (R. 271). For entertainment, N.D. colors or plays Play Station.

Ms. Diaz testified that N.D. has poor frustration tolerance, "flips out" and cries if other children ridicule her (R. 274), and does not befriend any of the other children in her class. When N.D. is depressed, she upsets the household and physically strikes her and her brothers. Ms. Diaz testified that on a bad day at school, N.D. says that she wants to die, or that she will kill herself because her mother doesn't love her (R. 278). Ms. Diaz testified that N.D. has only one good day per month at school, and that she has been called by the school about 6 or 7 times this year due to misbehavior (R. 280).

The ALJ found Ms. Diaz lacked credibility since her complaints were far beyond what the test scores and evaluations showed.

The judge then questioned N.D. who was 10 years old at the time of the hearing. N.D. stated she likes school, liked reading a lot and had been using Leap Frog books which help if she does not know a word (R. 284).

III.

**Evaluation of Child Disability**

An individual under the age of 18 shall be considered disabled if she has a medically

7

determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

To evaluate whether a child is disabled and eligible for SSI, a three-part sequential analysis is used. First, if the child is doing substantial gainful activity, the Commissioner will determine that the child is not disabled. 20 C.F.R. § 416.924(b). Second, if the child is not working, the Commissioner will determine whether the child's impairment is severe. *Id.* Third, if the impairment is severe, the Commissioner must determine whether the impairment "meets, medically equals, or functionally equals the listings." *Id.*

The method to decide whether an impairment is functionally equivalent in severity to a listing is set forth in the regulations. Generally, these regulations provide that a child's functioning is assessed within a framework of six broad areas of functioning called domains. There are six domains of functioning used in determining functional equivalence. They are (1) acquiring and using information; (2) attending to and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) ability to care for oneself; and (6) health and physical well being. 20 C.F.R. § 416.926a(b)(1)(I)-(vi). The regulations also set forth other factors taken into consideration when evaluating the effects of an impairment on a child's functioning. These factors include how functioning compares to the functioning of children of the same age who do not have impairments and how well the child initiate, sustain and complete his/her activities, including the amount of help or adaptation needed. 20 CFR 416.924(a). For a child to functionally equal a listed impairment, he or she must have marked limitations in two domains or an extreme limitation in one. A marked limitation in a domain is found when an impairment interferes seriously with a child's

ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2). A marked limitation is more than moderate but less than extreme. *Id.* An extreme limitation in a domain is found when the impairment interferes "very seriously" with a person's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3). In addition, an extreme limitation is more than marked and is a description given to the worst limitations. *Id.*

IV.

According to plaintiff's counsel, the ALJ erred because he failed to "tell us why" each of the three severe impairments (depression, anger management and learning disability) were not marked or extreme in each domain. This assertion is contrary to what the ALJ's opinion states (see p. 5-11 of the Opinion). For example, for the domain of "acquiring and using information", the ALJ found a marked limitation. The ALJ's opinion is on point. He notes some of the issues children have in this domain:

> Some examples of difficulty children would have in acquiring and using information are: (i) does not demonstrate understanding of words about space, size, or time; e.g., in/under, big/little, morning/night; (ii) cannot rhyme words or the sounds in words; (iii) has difficulty recalling important things learned in school yesterday; (iv) has difficulty solving mathematics questions or computing arithmetic answers; (v) talks only in short, simple sentences and have difficulty explaining what she means.

Knowing these difficulties, the ALJ outlined the evidence on which he relied to show a marked limitation. The ALJ opined:

> The claimant has "marked" limitation in acquiring and using information. In evaluating this domain, I have reviewed and considered a psychological evaluation, a teacher questionnaire, a consultative psychological examination, two (2) IEP (Individualized Education Program) reports, and a New Jersey State standardized proficiency test report. According to the medical report, the claimant,

9

> presently age 10, enrolled in special education classes, had a verbal IQ test score in the 70's, performance scale IQ and full scale IQ test scores in the 80's.  She reads at the 1.3 - 1.5 grade level (Exhibit 8F). Additionally, she exhibits "marked" problems with reading and comprehending written material and she has difficulty learning new material  (Exhibits 1F - 10F),
>
> Therefore, based upon the above, I find that the claimant has a "marked" limitation in acquiring and using information.

With regard to the domain "attending and completing tasks", Social Security regulation 20 CFR 416.926a(h)(3) sets forth some examples of limited functioning in this domain that children of different ages might have.  The examples do not apply to a child of a particular age; rather, they cover a range of ages and developmental periods.  In addition, the examples do not necessarily describe a "marked" or "extreme" limitation in the domain. Some examples of difficulty children would have in attending and completing tasks are:  i) easily startled, distracted, or over reactive to sounds, sights, movements, or touch; (ii) slow to focus on, or fail to complete activities of interest, e.g., games or art projects; (iii) repeatedly become sidetracked from activities or frequently interrupt others; (iv) easily frustrated and give up on tasks, including ones he/she is capable of completing; (v) require extra supervision to keep you engaged in an activity.

The ALJ found that N.D. has "less than marked" limitations in attending and completing tasks, and set forth his reasoning in the Opinion as follows:

> According to the totality of medical evidence, with respect to this domain, the claimant has mild problems with distractibility, focusing and concentration. From January 11, 2005 to June 16, 2006, claimant was treated by Dr. Liu, a psychiatrist, who diagnosed a depressive disorder, on the basis of a mental status examination findings including a depressed affect and feelings of hopelessness. However, it is significant to note that Dr. Liu described the claimant's concentration, attention span and memory as "intact".  Additionally,

> on intake the child was assessed with a GAF scale test score of 58
> which is consistent with "moderate" symptoms or difficulty
> functioning in a social or school setting. Lastly, I note that the child's
> performance on recent New Jersey State standardized proficiency
> testing performed in the Spring 2006 revealed partially proficient
> levels in language arts, literacy and mathematics and a proficient level
> of testing with respect to science.

It is also noted that at the end of the school year (June 1, 2005), the Carteret Department of Special Services met to discuss N.D.'s fourth grade education program and N.D. had shown a dramatic change since September of that same school year, and that the "days where it was a battle to get her to work and her attitude was unbearable" had become "fewer and farther apart." Her anger arose less often. At that time, her teachers were proud of her progress. N.D. was still reading at a first grade level, but had strong math skills (was working at grade level in math). (R. 149-182). The following year (February, 2006) Individualized Educational Program (IEP) found N.D.'s learning and/or language disabilities to be "mild/moderate." (R. 183-210), and that N.D. was not exhibiting behavior that would impede her learning or that of others. (R. 187). These findings support a conclusion of "less than marked" limitation in attending to and completing tasks.

In another domain, "interacting and relating with others", the ALJ carefully noted that N.D.'s impairments were not marked or extreme limitations. He reviewed the facts upon which his conclusions were based. The ALJ carefully ruled that the claimant has "less than marked" limitation in interacting and relating with others. The opinion states in part:

> In considering this domain, there is evidence of some difficulties
> following rules and expressing anger both at home and in school. Dr.
> Liu and Dr. Dubro, a consultative psychologist, who examined the
> claimant on January 26, 2005, have diagnosed the claimant with an
> anger management disorder manifested by temper tantrums,
> disruptive behavior in school and fighting with her peers and siblings

(Exhibits 3F, 5F, 10F). Additionally, a teacher questionnaire dated January 6, 2005 shows that the claimant has anger management issues (Exhibit 2F). However, the medical evidence does not establish that this condition is "marked". In that regard, I note that both IEP reports in the record state that the claimant's behavior does not impede her learning or that of others (Exhibits 7, 8F). Moreover, although the claimant's mother cites constant fighting with one of her siblings, it is not clear from the treatment notes which child initiates the fighting. In this regard, I must note that at least one of her siblings (both are receiving Supplemental Security Income benefits) has a mental impairment and the claimant's fighting may therefore to be her fault. Thus, I find that the claimant has "less than marked" limitation in the domain of interacting and relating with others.

_____In another domain, the ALJ found that the claimant has "no limitation" in the domain of "moving about and manipulating objects." The ALJ found:

In this case, the claimant alleges disability solely on the basis of non-exertional, mental impairments. According to the medical record, there is no evidence to demonstrate that the alleged and diagnosed medical impairments affect the claimant's ability to move her body from one place to another and move and manipulate objects (i.e. - gross and fine motor skills; 20 CFR 416.926a(j)(3); Exhibits 1F-10F).

Accordingly, I conclude that the claimant has "no limitation" in the domain of moving about and manipulating objects.

In another domain, the ALJ found that the claimant has "less than marked" limitation in the domain of "caring for yourself." The regulation (20 CFR 416.926a(k)(3)) sets forth some examples of limited functioning in this domain that children of different ages might have. The examples do not apply to a child of a particular age; rather, they cover a range of ages and developmental periods. In addition, the examples do not necessarily describe a "marked" or "extreme" limitation in the domain. Some examples of difficulty children would have caring for themselves are: (i) continue to place non-nutritive or inedible objects in their mouths; (ii) often uses

12

self-soothing activities showing developmental regression (e.g., thumb sucking, re-chewing food), or have restrictive or stereotyped mannerisms (e.g., body rocking, headbanging); (iii) do not dress or bathe appropriately for age because of an impairment(s) that affects this domain; (iv) engaging in self-injurious behavior (e.g., suicidal thoughts or actions, self-inflicted injury, or refusal to take medication), or ignoring safety rules; (v) do not spontaneously pursue enjoyable activities or interests; (vi) has disturbance in eating or sleeping patterns.

It does not appear that N.D. has marked difficulty in caring for herself. She dresses and bathes herself, and her depression is being managed with Zoloft.

The ALJ addressed this domain in part as follows:

> In this domain, the medical records reveal some difficulty evident with handling frustration and being patient as a result of the claimant's depressive and anger management disorders. As previously mentioned, the claimant receives psychiatric treatment from Dr. Liu, and according to the hearing testimony of the claimant's mother in September 2006, her daughter's dosage of Zoloft, an antidepressive medication, was to be increased. However, the record was left open and recent treatment notes from Dr. Liu were submitted (Exhibit 10F). They do not corroborate the mother's hearing testimony. In fact, the claimant's mother missed the September 2006 appointment for her daughter with Dr. Liu and has a history of missing others. Moreover, the treatment notes of Dr. Liu reflect considerable improvement on medications and with therapy and do not support a finding of "marked" impairment in this domain (Exhibits 5F, 10F).
>
> Consequently, I find that the claimant has "less than marked" limitation in the domain denoted the ability to care for herself.

Finally, the ALJ concluded that N.D. has "no limitation" in the domain of "health and physical well-being". He opined:

13

> In this case, there is no evidence to suggest that the cumulative physical effects of the claimant's alleged mental impairments have adversely affected or even resulted in any "physical" effects on her health and physical well being.
>
> As a result, I am constrained to find that the claimant has "no limitation' in the domain of health and physical well being.
>
> Accordingly, the claimant does not have an impairment or combination of impairments that results in either "marked" limitations in two domains of functioning or "extreme" limitation in one domain of functioning.

As noted, the issue is whether the ALJ's decision was based on substantial evidence. When severe impairments occur, the ALJ must use the domains to determine whether they are extreme or marked limitations. As analyzed above, the ALJ reviewed each of the domains against the credible evidence. He found no "extreme" limitations in any of the domains, and since there was only one domain with a "marked" limitation, no disability could be found. 20 C.F.R. § 416.926(b).

The decision of the ALJ meets the standard of review upon which Plaintiff relies. It is a well reasoned opinion and considers all the evidence. The decision of the ALJ is affirmed. Plaintiff's complaint is dismissed with prejudice.

*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.

March 24, 2009

14